[Crim. No. 5082. In Bank. Aug. 11, 1950.]

THE PEOPLE, Respondent, v. PAUL GUTIERREZ, Appellant.

Margolis and McTernan, Ben Margolis, William B. Murrish, Lawrence Kennedy, Wm. C. Meux and John J. Gallagher for Appellant.

Fred N. Howser, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Respondent.

CARTER, J.—The defendant, Paul Gutierrez, having waived a jury, was tried by the court, found guilty of murder in the first degree and was given the death sentence. The

defendant was charged with having murdered one Josephine Yanez, a human being, to which charge he pleaded not guilty and not guilty by reason of insanity.

On the evening of November 19, 1949, Mr. and Mrs. Jose Yanez and their two children, one a baby of about 3 months and the other, Josephine, an infant of 17 months, went to dinner at a restaurant in Huron. Some time after dinner (the testimony as to the exact time is conflicting), the couple stopped at a drugstore to call for Mrs. Yanez' sister who worked there. At approximately 11:30 that same evening these three adults and the two children arrived at a dance hall in Huron where they parked the car. It appears that Mrs. Yanez' sister went into the hall where she stayed until the dance was over, but that either Mr. or Mrs. Yanez stayed in the car with the children with the exception of two occasions. On one of these occasions the parents went into the hall and some friends stayed with the children. On the second occasion, which apparently was at about 10 minutes of 1 o'clock, Mr. Yanez went to look for Mrs. Yanez who had taken the younger child into the dance hall with her, leaving Josephine unattended in the car. When the parents came out of the hall at approximately 1 o'clock, Josephine was not in the car. She had been asleep when Yanez left her and was lying on the back seat fully dressed in diapers, shirt, dress, shoes, socks, coat and bonnet. The car was parked about 45 to 50 feet from the door of the dance hall. At about noon the next day, the father of the child reported to the constable of Coalinga Township, Fresno County, that the child was missing and that the family and their friends had searched for her. On the same day, November 20th, the constable and others engaged in the search found part of the child's clothing about 100 yards from the dance hall. *The clothes found in this spot* consisted of the diapers, the coat, a shoe and a man's jacket. The man's jacket was identified as that with which she had been covered. Later that day, at about 5:15 or 5:30, the body of the child was discovered about 200 yards from the dance hall. It was lying in a small irrigating furrow in a field. The child's bonnet was still attached to it by the string around its neck; under the baby were the shirt and dress, and it was wearing a shoe and sock on one foot.

Witnesses testified that approximately 6 to 8 feet from the place where the clothing was found, there were recognizable footprints in the mud and that these footprints led out across the field. Photographs and casts made of these footprints

showed the words "Bilt Rite" clearly imprinted on the mark made by the heel of the shoe. These casts and photographs were compared with shoes identified by the defendant as the ones worn by him that night and were found to be identical. About halfway between the spot where the body was found and the first footprint, was a place where the mud had been disturbed. The witnesses testified that they believed that the person whose tracks they had been following had slipped and fallen there. Clearly visible in the mud were marks that had been made by cloth or heavy woven material, the imprint of three buttons and fine indentations such as would have been made by the hair on a person's arm or head. Photographs and casts were also made of these imprints and indentations and later compared and identified with the weave, markings and buttons on a jacket admittedly owned and worn by the defendant on the night in question. At the place where the body was found, more tracks and imprints were found. Mr. Nevins, deputy sheriff of the county, testified as follows: "Q. Were there any more tracks or imprints found where the body was found? A. Yes. Alongside the body and in front—I would say in front of the body. In front of the head, the way the body was lying, we found the same print that we found where the person had fallen . . . Q. You mean the cloth prints, Mr. Nevins? A. The cloth prints. I refer to those. We found those shortly after we arrived there the night the body was discovered, and made casts of them at that time. Q. Were there any depressions of any kind out where the baby's body was found? A. There was five depressions in the mud. They were—it appeared that they were round, probably five inches across, and one or two of them was three inches deep. Q. All right. And did you see any marks within those depressions? A. In one we made a cast of a mark as cloth marks, and there was a seam as would appear on a person's trousers that had been sewn on trousers." (The depressions just referred to were later identified as knee marks and the impressions made by the fibers in the cloth identified with that in the trousers worn by the defendant on the night of November 19th.) A witness testified that he had seen the defendant with mud on his face and the knees of his trousers.

Dr. C. D. Newel, a licensed physician and a specialist in pathology, performed the autopsy on the body of the child and testified to the condition he found. This description is far from pleasant, but in view of the arguments made by the

three attorneys for the defendant, it seems advisable here to set it forth in some little detail. He testified first that the child's body was unclothed, except for the bonnet and one shoe, and that it was covered with mud; that the mouth, the nose, the trachea, larger bronchi and the lungs were filled with mud. "A. (Dr. Newel): From there, with — we noticed that there was round circular marks on the baby's body. They were on the — just above the left nipple on the chest, there appeared to be at least two or three circular marks, that we measured about one and three quarters inches in diameter. There was one over the upper abdomen on the anterior surface. There was one on the right groin. There was one, or maybe two overlapping in the region of the vulva. That is right above the vagina." The doctor stated that in his opinion these marks were "bite marks" made during the lifetime of the child and would have caused "considerable pain," and that he found the same marks on the child's mouth. In response to a question as to any further examination, he testified: "Next the examination was made of the vagina and rectum. The place where normally the vagina should be consisted of a torn, lacerated hole which would admit one finger easily for a depth of about two inches. The rectum did not appear to be torn, although it would also admit one finger readily. This hole was outside the rectum. The vagina itself was unrecognizable due to the extensive tearing." He stated that in any female child of that age, the rectum might be the same size but that the vagina would not have been, and that he thought that "something" had been inserted in the vagina of the dead child. The doctor testified that there was very little hemorrhage at this point at the time of his observation and no indication that there had been a great deal of hemorrhage. The conclusion drawn by him from this fact was that this particular injury to the child had probably occurred after her death. Further testimony by the doctor showed that there was hemorrhage in the *pericardial* (obviously an error on either the part of the court reporter or the doctor since the pericardium is the conical sac of serous membrane which encloses the *heart*. This assumption of error is based on the fact that he then uses the word "or") *or* abdominal cavity (peritoneal cavity is correct for abdominal cavity) caused by multiple lacerations and tearing of the liver and that he thought "this was (caused) probably through trauma; outside trauma, or great body on the body or jack-knifing of the body . . ." His testimony showed that there

were multiple bruises and hemorrhage into the tissues about the face and forehead and hemorrhages over the surface of the brain. He testified as follows: "So the cause of death could be one of several; there was enough hemorrhage within the brain to cause death. The mouth and nose were plugged with mud, which would cause suffocation. The lacerations and contusions about the vagina, if unattended would undoubtedly cause fatal hemorrhage . . ." He stated that in his opinion at the time the baby's face was in the mud it was undoubtedly alive; that the hemorrhages about the head and brain occurred after death; that the rupture of the liver could have been caused "if the child had been grasped about the abdomen and in falling, undue pressure had been put on the abdomen with displacement of the liver"; that a fall or blow that caused the liver to rupture would have brought about unconsciousness; that the ruptured liver occurred before death and that he "would say that a person would live (thereafter) only a matter of 15 to 30 minutes . . ." He testified that tests had been made and that no spermatazoa had been found in the region of the vagina.

The defendant's account of his activities on the night in question as he testified to them at the trial (admittedly having lied when first questioned by the authorities) is that he and a friend, Manuel Gutierrez (who was not related to the defendant) went to the China Café where he consumed about eight bottles of beer, three drinks of whiskey from a bottle belonging to another friend, and after eating dinner, smoked one marijuana cigarette. These events occurred before and up to a little after 10 o'clock. He then went to the Huron dance hall, arriving there, he thinks, about 11 o'clock. He remembers asking different girls to dance and that they refused to do so. He testified that he stayed half an hour or an hour and that when he went outside he heard a baby crying. He says that he opened the car door, that the baby was lying down on the back seat, that he picked her up and spanked her a little bit and that "I couldn't remember what happened then." He later said that the baby cried about 10 minutes and that he remembers walking away with her. He adhered to his lack of memory of any event after that until he woke up the next morning and maintains that he did not know what his friends were talking about when they spoke of the baby that had disappeared and that he did not know that the baby was dead until he heard of it Monday morning. He admitted

that there was mud and blood on the clothing he had worn that night.

The defendant was examined by three court-appointed psychiatrists with respect to the use of marijuana in conjunction with the use of alcoholic beverages to determine whether he could have had the requisite intent to commit the crime with which he was charged, and to determine whether or not the two, either singly or together, could have caused a temporary loss of memory. These three psychiatrists, after extensive examinations of the defendant, each testified that, in his opinion, the accused could, if he chose to do so, remember and relate his actions on the night in question after he took the baby from the automobile.

The People contend that defendant is guilty of murder in the first degree because (1) the killing was premeditated; (2) it was perpetrated by means of torture (Pen. Code, § 189); and (3) it was committed in the perpetration or attempt to perpetrate rape (Pen. Code, § 189).

The third contention of the People must be sustained, and we are not, therefore, called upon to consider or pass upon the sufficiency of the evidence on the issues of premeditation or torture.

While the evidence is circumstantial, it is clearly sufficient to support the inference that the child's death resulted from the perpetration of or attempt to perpetrate the crime of rape. The record discloses that defendant partially disrobed the child before he started to carry her off across the field. His footprints were found in the same place where the baby's diaper and coat were found and from this the inference is strong that he had then formed an intent to rape her. The instant case is, in its physical aspects, much like that of *People* v. *Fountain,* 170 Cal. 460 [150 P. 341], where a 10-year old girl was found "strangled to death with a rope which was found tightly tied around her neck. Upon her body were found bruises and marks of violence and her sexual organ was lacerated in a shocking manner by the hands of the defendant. This was admitted by the defendant and a confession which he made, introduced in evidence, showed that the killing of the child was committed by him in connection with a lecherous and brutal attack which he had made upon her for the purpose of arousing and gratifying an unnatural passion." This court held that although there was no evidence in the record to show that the child had been raped, it did show that she had died because of a violent and brutal attack upon her person in

an unnatural gratification of the passions of the defendant, and that her death under such circumstances warranted the jury in finding him guilty of murder of the first degree.

The medical testimony here shows that the child had been treated so brutally that it was impossible, because of lacerations, to state with certainty whether or not there had been any sexual penetration. The evidence, as just pointed out, is sufficient to show that the defendant intended to gratify his desires when he disrobed the child. This evidence, together with that showing the bruised and torn condition of the body, is ample to sustain a conclusion that the homicide, within the meaning of the statute, had been perpetrated in an attempt to commit rape. The absence of any evidence of rape in the vaginal tract does not establish that rape was not intended or attempted. (*People* v. *Brown,* 22 Cal.2d 752 [141 P.2d 1]; *People* v. *Diaz,* 26 Cal.2d 318 [158 P.2d 194]; *People* v. *Lindley,* 26 Cal.2d 780 [161 P.2d 227].)

Section 189 of the Penal Code provides that all murder which is committed in the perpetration or attempt to perpetrate rape is murder of the first degree. If the record affords substantial support for the conclusion that one of the enumerated felonies was perpetrated or attempted, and the killing was committed in such perpetration, or attempt, the judgment must be affirmed. (*People* v. *Lindley, supra,* and cases there cited.) After conviction all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence to support it. (*People* v. *Latona,* 2 Cal.2d 714 [43 P.2d 260]; *People* v. *Green,* 13 Cal.2d 37 [87 P.2d 821]; *People* v. *De La Roi,* 36 Cal.App.2d 287 [97 P.2d 836].)

If the child died as a result of the ruptured liver sustained when defendant fell upon her, the conclusion is still inescapable that her death occurred in an attempt to perpetrate one of the felonies enumerated in the statute and it is unavailing to argue that the shocking acts performed upon her body took place after her death.

Dr. Toller, one of the court-appointed psychiatrists, testified that he was of the opinion that the effect of the beer, liquor and marijuana cigarette would have disappeared by the time the crime was committed and that the defendant would be able to form an intent at that time. He stated, too, that amnesia seldom occurs in the form in which it was alleged to have occurred in this case, that is, that the defendant would be

able to remember everything up to a certain time and then have a complete "black-out" until the next morning. Dr. Adams and Dr. Briden, the other psychiatrists, testified to substantially the same effect, and stated that they, too, considered the defendant fully capable of forming an intent at all times on the night in question. They were also of the opinion that he did not suffer any loss of memory.

The defendant, through his attorneys, sought to withdraw his plea of not guilty by reason of insanity but the court refused to permit the withdrawal. The trial proceeded and upon the testimony of the three psychiatrists, based upon their examinations of the defendant, the court found him sane.

A reading of the record in this case discloses that defendant's rights and interests were fully protected by his counsel and by the court, and that he was accorded a fair trial in all respects.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied September 7, 1950.