[Crim. No. 30354. Second Dist., Div. Five. Mar. 21, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER ALVARADO MEDINA, Defendant and Appellant.

COUNSEL

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Janice L. Feinstein, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUS, P. J.—Defendant Peter Alvarado Medina was convicted by a jury of second degree murder. The jury found that defendant had used a firearm in the commission of the offense. Probation was denied and defendant was sentenced to prison.

### FACTS

At about 9 p.m., on July 8, 1976, the victim, William Webb, was shot in the face and shoulder with a shotgun. He died the next day.

Paul Parrilla was standing in the street when he saw Webb, his brother-in-law, walking towards him. He then saw a 1955 Chevrolet and a 1972 Pinto, "packed with people," coming towards them. He had seen the cars about five minutes earlier, at which time the passengers had yelled out, "Eastside," the name of a gang in the area. Once again the cars stopped and the passengers yelled, "Eastside." Parrilla then saw a man, whom he knew as "Spanky," get out of the driver's side of the Chevrolet and point a bolt action rifle at him. Defendant got out of the passenger's side of the Chevrolet and also pointed what looked like a rifle. Spanky fired three shots at Parrilla and then, as Parrilla ran down the street, several more. As he was running Parrilla also heard two shotgun blasts. From these he concluded that defendant's weapon was a shotgun.

Augustine Castillo, who lived nearby, looked outside when he heard some shooting in the street and saw two men firing from a handgun and a shotgun. Jerry Kitchel, another neighbor, looked out his window when

he heard shots and screaming; he saw four young men run to a 1955 Chevrolet. One of the men resembled defendant and was carrying a shotgun.

Parrilla was shot in the foot and fell down as he was running. After he saw defendant and Spanky drive away, he ran towards William Webb and found him shot in the face and shoulder. Webb was taken to the hospital and, as noted, died the next day. Parrilla told a police officer at the hospital that defendant had shot Webb. He later identified a picture of defendant.

At about 4:30 in the afternoon on the day of the shooting, defendant talked with Mark Aubel, a federal undercover agent, who was investigating the Eastside gang's possession of weapons. When Aubel pretended to be going to the area of the rival Northside gang, defendant said, "Hey, I'm young enough. I can waste a couple of them guys. I can do the time." Another federal agent, Tom Herset, also heard these words. Aubel smelled alcohol on defendant's breath.

Later, sometime after 9 p.m. on the night of the shooting, defendant and Aubel met again. Defendant told Aubel, "Hey, we just wasted two dudes from Northside," and explained that he had shot twice from a shotgun and had picked up the empty casings from the shotgun shells. He gave Aubel some unexploded shells to keep for him. Aubel and defendant then drove by the street where the shooting had occurred and went to defendant's mother's house. At about midnight, defendant showed Aubel the shotgun which he had used. They then drove back to the scene of the crime. Aubel was wounded by a shotgun blast from a house. He was struck by six pellets. Defendant fired back with his shotgun and then jumped from Aubel's car. Aubel was arrested a few minutes later and told police that he was an undercover agent.

On July 14, defendant called Aubel and said he was turning himself in because he heard that the police had a warrant out for his arrest and "they had no evidence whatsoever, no gun, nothing, no witnesses, nothing to tie him to the shooting," and they could keep him only 72 hours for questioning.

### Defense

Defendant, his mother, his girl friend, and a friend, testified that defendant spent the entire day and evening of July 8, drinking beer and

talking at his mother's home, which was seven blocks from the scene of the murder.

Ronald Garcia, defendant's friend, testified that he was with defendant at defendant's mother's home from noon until 10:30 or 11 p.m., except for a 10-minute period at about 7:30 p.m., when Garcia left to get more beer.

Sylvia Espinoza, defendant's girl friend, testified that she was with defendant from about 10:30 a.m. until about 11:30 p.m., when she had to go to the hospital. Defendant was too drunk to accompany her.

Carmen Amaya, defendant's mother, testified that he was at her home from about 10 a.m. through the day and evening. She took Sylvia Espinoza to the hospital at about 9 p.m. Sylvia was having a miscarriage of defendant's baby. The witness would not let defendant go with them because he was so drunk that he was "falling all over the place." They had to wait in the hospital for about three or four hours before Sylvia was finally admitted around midnight.

Defendant testified that he had quite a bit to drink and that after his mother and Sylvia left for the hospital, he drank a little more and fell asleep. He knew, however, what he was doing and it is not possible that he might have gone to the scene of the murder without remembering having done so. He left the next morning for Los Angeles and stayed away until July 14, when he turned himself in.

Defendant also offered evidence to the effect that Parrilla said he was going to testify against defendant because defendant was from a rival gang.

## DISCUSSION

The jury was given instructions on first and second degree murder. At the People's request the jury was also instructed on the defense of alibi. ■ However, the trial court refused a series of instructions requested by defendant on voluntary intoxication, manslaughter, and diminished capacity. All the rejected instructions were predicated on the theory that the totality of the testimony presented "evidence deserving of consideration" that defendant killed the victim while too intoxicated to be capable of harboring malice.

The applicable principles cannot be questioned. ■ Defendant had a constitutional right to have the jury instructed on "every material question upon which there *is any evidence deserving of any consideration whatever.*" (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281], see also *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Poddar* (1974) 10 Cal.3d 750, 760-761 [111 Cal.Rptr. 910, 518 P.2d 342].) Further: when the trial court refuses an instruction which the *Carmen* standard requires, the error is a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution. (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33]; see also *People* v. *Sedeno, supra,* at p. 720.) Nevertheless, as "an obvious corollary, where there is 'no substantial evidence of diminished capacity' the court does not err in refusing to give instructions based on that defense." (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 151 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513].)

■ Defendant advances his argument that he was entitled to diminished capacity instructions, in spite of the fact that no single witness to the homicide even hinted that he was intoxicated,[1] while no single witness to defendant's intoxication—including defendant himself—placed him anywhere near the scene of the crime. Defendant's point is therefore necessarily predicated on the theory that the jury, while rejecting the alibi portion of the defense witnesses' testimony, could nevertheless base a reasonable doubt on the issue of malice on the same witnesses' evidence of defendant's intoxication.

The issue is not as defendant argues, whether he was entitled to have the jury instructed on inconsistent defenses. Of course he was. (E.g., *People* v. *Rodriguez* (1969) 274 Cal.App.2d 487, 497-498 [79 Cal.Rptr. 187]; *People* v. *Stewart* (1968) 267 Cal.App.2d 366, 374 [73 Cal.Rptr. 484].) It is, more simply, whether a defense "deserving of any consideration whatever," inconsistent with defendant's alibi was presented.

We do not question a jury's right to accept part of the testimony of a witness, while rejecting the rest. (E.g., *Hansen* v. *Bear Film Company Inc.* (1946) 28 Cal.2d 154, 184 [168 P.2d 946]; *People* v. *Langley* (1974) 41

---

[1]Defendant's contention that Aubel, the undercover agent, also testified to evidence of intoxication is unsupported by the record. Aubel testified that earlier in the day he smelled alcohol on defendant's breath. He also testified, unequivocally, that when he saw defendant just after the shooting, defendant did not smell of alcohol; rather, he was "pretty hyper," excited, and his "adrenaline was pumping, pumping fast...."

Cal.App.3d 339, 348 [116 Cal.Rptr. 80].) Yet, while the rule that liars often speak the truth is, as Wigmore points out (3A Wigmore, Evidence, § 1010 (Chadbourn rev. 1970)) rooted in experience and common sense, these faculties—rather than any legalistic formula—also tell us how far the rule can be stretched in any particular case.

Here the entire thrust of the defense testimony was that at the time of the murder defendant was at his mother's home. Obviously it did not trigger a reasonable doubt that he was, in fact, participating in a well executed, hit-and-run street assassination. It defies common sense that a jury, which has so decisively rejected the alibi sworn to by four witnesses, would nevertheless rely on one incidental aspect of that alibi—defendant's intoxication—for the purpose of entertaining a reasonable doubt as to his capacity to harbor malice seven blocks away. To have given the requested instructions would have been an insult to the jurors, as well as an embarrassment to the law, the court and even, we suspect, to the defense.[2]

## Probation Report

■ Defendant claims that he was denied a fair probation and sentencing hearing because "the probation report contained a substantial amount of improper material," including eight juvenile arrests for which no disposition was shown and ten other juvenile matters that were dismissed.

Appellate attacks on the contents of probation reports are much in fashion. (E.g., *People* v. *Phillips* (1977) 76 Cal.App.3d 207, 213-216 [142 Cal.Rptr. 658] *People* v. *Molina* (1977) 74 Cal.App.3d 544, 551 [141 Cal. Rptr. 533]; *People* v. *Romero* (1977) 68 Cal.App.3d 543, 549-550 [137 Cal. Rptr. 675]; *People* v. *Herron* (1976) 62 Cal.App.3d 643, 646-647 [133 Cal. Rptr. 287]; *People* v. *Morales* (1975) 49 Cal.App.3d 732, 738 [122 Cal.Rptr. 804]; *People* v. *Calloway* (1974) 37 Cal.App.3d 905, 908-909 [112 Cal.Rptr. 745]; see also *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 719-721 [135 Cal.Rptr. 392, 557 P.2d 976]; *People* v. *Peterson* (1973) 9 Cal.3d 717, 727 [108 Cal.Rptr. 835, 511 P.2d 1187]; *In re Michael R.* (1977) 73 Cal.App.3d 327, 335, fn. 5 [140 Cal.Rptr. 716].) None of these cases reveals whether the claim that the probation report contains improper

---

[2] How does one shift gears from a solid, total defense presented by a handful of witnesses, to a partial one which demands that these same witnesses be branded as perjurers? This aside should not be misconstrued to mean that there was harmless error. There was no error.

material was advanced in the trial court. None, therefore, discusses whether a trial court objection is a necessary predicate to appellate consideration.

We hold that it is. The cases demonstrate that the inclusion of improper material in a probation report does not necessarily lead to a reversal for the purpose of resentencing. In fact, the only criminal case in which that was the result is *People* v. *Romero, supra.* In all other criminal cases the judgment was affirmed either because the prejudicial information was adequately supported by other information, or because the appellate court concluded that the trial court had not relied on the objectionable parts of the report.

While it is well within an appellate court's powers to sort out what is and what is not a proper entry, the determination of the factors which moved a trial court to sentence as it did necessarily rests—at least to some degree—on speculation. Having participated in quite a few such cases—mostly not certified for publication—we know how much we would have been aided by a clear statement from the trial court concerning the matters which it did and those which it did not take into account. In each such case, a proper objection to the consideration of improper entries would have called for a ruling which would have clarified the matter. We therefore hold that unless the record shows an objection to allegedly improper entries and an erroneous ruling thereon, the issue is simply not available on appeal.[3]

Without wishing to weaken this holding, we point out that in this case trial counsel not only failed to object but, after the court had announced that it had "received, read and considered an 11 page typewritten probation report . . ." specifically asked the court "to take note of Mr. Medina's record. It appears to be lengthy starting out at approximately age 13, but most of the offenses there, the Court will note, involved 647f and glue sniffing; and throughout all that lengthy arrest record, at no time does it ever appear that Mr. Medina was ever committed to probation camp, was ever sent to CYA, was ever given anything but a disposition of being placed back home on probation in an environment which, I think the Court will have to agree, contributed largely to the situation that Mr. Medina finds himself today."

[3]It is immaterial whether section 353 of the Evidence Code applies directly to probation hearings. The section is but an application of the ancient principle that "[c]ourts will not permit a party to give an apparent acquiescence which will operate to mislead and entrap his adversary." (*Goodale* v. *West* (1855) 5 Cal. 339, 341.)

Thus, not only did counsel fail to object to the report, he even tried to turn it to his client's advantage.

Affirmed.

Stephens, J., and Ashby, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 18, 1978.