[Crim. No. 21484. First Dist., Div. Two. Oct. 8, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
LAMBERT GEORGE CHAMBERS, Defendant and Appellant.

446

[black redaction bars]

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Neil Rosenbaum, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Gloria F. DeHart and Ronald D. Smetana, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GRODIN, P. J.**—Appellant was found guilty by a jury of first degree murder (Pen. Code, §§ 187, 189), rape (Pen. Code, § 261) and conspiracy to commit credit card forgery (Pen. Code, §§ 182, 484f). The amended information alleged one special circumstance under the murder count—that appellant murdered his victim during the commission or attempted commission of rape (Pen. Code, § 190.2, subd. (a)(17)(iii)) —which the jury found to be true. Special allegations that the defendant used a deadly weapon (a knife) in the commission of the murder and rape (Pen. Code, § 12022, subd. (b)) were also found to be true. Appellant was sentenced to life imprisonment without the possibility of parole for first degree murder pursuant to Penal Code sections 189 and 190.2, and sentence on the remaining counts was suspended.

Appellant raises numerous issues on appeal. He contends that the trial court committed prejudicial error in admitting hearsay statements of the deceased victim, in denying his motion for acquittal for insufficient evidence of rape, and in failing to instruct the jury on lesser included offenses of rape. He also challenges the constitutionality of the felony-murder rule, and of the statute applied to sentence him to life imprisonment without the possibility of parole. We will consider each of these contentions in turn.

## FACTS

On Monday evening, December 4, 1978, Ms. T., a young woman 20 years old, was killed in her apartment where she lived alone. She died from abdominal wounds inflicted with a kitchen paring knife. Her partially disrobed body was discovered the next morning. She had been sexually assaulted. Appellant was arrested on December 6, 1978, and charged with her murder and rape.

The day she was killed, Ms. T. had left work at about 6 p.m. and drove to her parents' home. Her mother and sister were there. She ate supper and left about an hour after she arrived. When asked why she was in a hurry to go home, she said she was expecting the defendant to come to her apartment.

Sometime between 7 and 8 p.m. Ms. T.'s ex-boyfriend called her. She terminated their conversation when someone knocked at the door.

When Ms. T. failed to appear for work the next day her employer called her family. Her brother and sister went to her apartment. The door was ajar and she was dead on the living room floor. She was lying on her back, legs spread, with her pants bunched up at her feet, and her shirt above her breasts. On the floor beside her was a small knife. There were no identifiable fingerprints on the knife. It was later discovered that several things were missing from the apartment: a television set, a clock radio, an iron, and Ms. T.'s purse.

The first police officer on the scene observed no sign of forced entry to the apartment or of ransacking inside. Only the kitchen silverware drawer was open.

An autopsy was performed by a forensic pathologist who found that two abdominal knife wounds inflicted with great force resulted in Ms. T.'s death within minutes after their infliction, and within one to two hours from the time of her meal with her mother and sister. Other wounds and bruises in the front of the neck occurred shortly before or during the fatal knifing. There had also been a massive blow to the back of her head during the course of the same violent incident.

There was also medical evidence that Ms. T. had been sexually assaulted shortly before she was stabbed. The autopsy revealed a bruise of the right labia majora and the left labia minora (at the entry to the vagina). The bruise marks were a little longer than an inch in their greater dimension. The pathologist opined that the bruising occurred at

the same time as the neck bruising, and shortly before death. It was caused by a fairly smooth-surfaced instrument which would be consistent with a human penis. He detected no semen and took no combings for foreign pubic hair because there was no indication that there had been trauma to the lower portion of the abdomen or to the thighs.

Police questioned Ms. T.'s sister who told them that Ms. T. said she was expecting appellant to come to her apartment the evening she was killed. Officers were alerted to be on the lookout for him. On December 6 he was spotted by an officer who recognized him. The officer observed appellant's vehicle proceeding toward him, made a U-turn to go after appellant and then observed that appellant was speeding, clocking him at 70 miles per hour in a 25-mile-per-hour zone. The officer caught up to him when his vehicle made a sharp turn and an abrupt stop.

Appellant was subsequently arrested and his car impounded and searched. Inside, the police found car stereo equipment and a store receipt for its purchase.

Next the police went to the home of appellant's 18-year-old girl friend where his family told them he had been staying. The girl friend was granted immunity in return for testimony against appellant. At trial she testified that on Monday, December 4, appellant left the apartment at 7:30 p.m. and did not say where he was going or when he would be back. He returned a couple hours later with fresh scratches on the left side of his lip and neck. From his car he retrieved the purse which he told her he had "snatched . . . from a girl." He suggested they use the credit card and she practice the signature. The following morning he brought in the television, clock radio, and iron saying they were his and that he got them from his mother's house. Later they purchased the stereo equipment with the credit card.

On cross-examination the girl friend conceded that when police first interviewed her she told them that appellant had brought the television set, clock radio, and iron to her house the morning before Ms. T. was killed. The inmate who shared a county jail cell with appellant while appellant was in custody awaiting trial testified that appellant said he had gone out with Ms. T. either the night she was killed or the night before, that she had given him all the items later found at his girl friend's apartment, and that Ms. T. was with him when he bought the stereo.

The defense was presented primarily through the testimony of appellant. In December 1978 he was 21 years old. He met Ms. T. a year earlier when they were college students and they had a romantic

relationship at that time. Sometime in 1978 he ran into her again and she asked him to lend her $250 which he did. At the beginning of December 1978 he left his parents' home to stay with his friend at her request while her grandmother (with whom she was living) was away. On Sunday, December 3, he played football and scratched his lip during the game. After the game he ran into Ms. T. again and she told him to come by that evening as she wanted to repay the loan.

That evening (Sunday) he did go to Ms. T.'s apartment. They had a drink and went for a ride and she told him she could not pay the $250 but suggested he use her credit card to buy something for himself. On the return to her apartment she lent him her iron and told him to keep her television set and clock radio as collateral in case he was unable to buy something with the credit card.

Thereafter he returned to his friend's apartment after arranging with Ms. T. to return Monday evening with the card and collateral and with some other items she had asked him to purchase for her. After he got home that same Sunday night he called Ms. T. to ask her about the credit card. She told him it was in her purse and that the purse was in his car. Appellant left everything in the car overnight.

On Monday he brought all the items into his friend's house. He tried to use the credit card during the day on Monday, but the stores would not accept it. Then he gave his friend a ride, washed his car, got something to eat, and went to the gym to play basketball. He called Ms. T. from the gym sometime between 7:15 and 8 p.m. to tell her he was unable to purchase the things with the card. She suggested he have a girl friend use it pretending to be her. She also said her boyfriend was mad at her and appellant should bring the items to her on Friday.

After playing basketball, appellant returned to his girl friend's house and left again a little later. He showed his girl friend the purse. He told her he got it from a "girl," that they should use the credit card the next day, and that he was going to return it. The next day, Tuesday, December 5, they purchased the stereo but the stores would not accept the card for the other items requested by Ms. T.

On Wednesday, December 6, he was driving and saw the police officer. He was not going over 45 miles per hour. He was headed for his parents' house but when he saw the officer he turned off to go back to his friend's house. He said he never saw Ms. T. the night she was killed.

## DISCUSSION

A. *Hearsay statements of the deceased victim.*

■ Evidence of the victim's statements to her mother and her sister, that she was going home early the evening she was killed because she was expecting appellant, was admitted over appellant's hearsay objection. Appellant contends that the court's ruling was error, and that the error requires reversal.

The trial court admitted the evidence on the authority of *People v. Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627], in which the Supreme Court held that two statements by the deceased victim that she was going out to dinner that evening with the defendant, came within the "state of mind" exception to the hearsay rule: "It was a declaration of intent to do an act in the future, offered as evidence that the deceased had the intent she declared and that the intent was probably carried out, namely, that she intended to and did go out that night with a man named 'Frank.'" (24 Cal.2d at p. 185.) After examining authorities from this and other jurisdictions, the court stated the "[e]lements essential to admissibility" of such statements as being "that the declaration must tend to prove the declarant's intention, at the time it was made; it must have been made under circumstances which naturally give verity to the utterance; it must be relevant to an issue in the case." (24 Cal.2d at p. 187.) Finding the first two conditions to have been met, the court stated, as to the third: "Unquestionably the deceased's statement of her intent and the logical inference to be drawn therefrom, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant." (24 Cal.2d at p. 188.)

Appellant contends that *Alcalde* was incorrectly decided, and that we need not follow it, because it has been superseded by contrary provisions of the Evidence Code.[1] In criticizing the majority holding in *Alcalde,* appellant is in good company. Justice Traynor, dissenting in that case,

---

[1]Appellant also contends in the alternative that *Alcalde* is distinguishable on the ground that the hearsay statements in that case gave rise to an inference of relevant conduct on the part of the declarant, whereas here, the fact that the declarant went home Monday night not being in dispute, the inference from her hearsay statements bore solely upon the conduct of defendant. The difference appears to us too subtle to support a different rule. In both cases, it is the fact that the declarant had an arrangement to meet the defendant that made the hearsay statement relevant. It takes two to tango.

Appellant would also distinguish *Alcalde* on the basis of the court's emphasis in that case upon the presence of other circumstantial evidence that the deceased was with the defendant on the night in question. (24 Cal.2d at p. 188.) Insofar as that may be a condition to the admissibility of such evidence, the condition is satisfied here as well.

observed that while a "declaration of intention is admissible to show that the *declarant* did the intended act, if there are corroborating circumstances and if the declarant is dead or unavailable . . . [a] declaration as to what one person intended to do . . . cannot safely be accepted as evidence of what another probably did. [Citation.] The declaration of the deceased in this case that she was going out with Frank is also a declaration that he was going out with her, and it could not be admitted for the limited purpose of showing that she went out with him at the time in question without necessarily showing that he went with her. . . . There is no dispute as to the identity of the deceased or as to where she was at the time of her death. . . . The only purpose that could be served by admitting such declarations would be to induce the belief that the defendant went out with the deceased, took her to the scene of the crime and there murdered her. Her declarations cannot be admitted for that purpose without setting aside the rule against hearsay." (24 Cal.2d at pp. 189-190, italics in original.) Justice Jefferson, in his 1 California Evidence Benchbook (2d ed. 1982) section 1.2, page 38, agrees that *Alcalde* was incorrectly decided.

Such criticism, however meritorious, does not relieve us of the responsibility for following Supreme Court precedent (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]), and appellant's proposition that *Alcalde* has been superseded by the Evidence Code is subject to considerable question. The Evidence Code was the product of a study and report by the California Law Revision Commission, and the commission, in recommending the adoption of what is now Evidence Code section 1250,[2] commented: "Section 1250 also makes a statement of then existing state of mind admissible to 'prove or explain acts or conduct of the declarant.' Thus, a statement of the declarant's intent to do certain acts is admissible to prove that he did those acts. *People* v. *Alcalde* 24 Cal.2d 177, 148 P.2d 627 (1944)." (7 Cal. Law Revision Com. Rep. (1965) p. 1235.) The commission's comments were ultimately approved by the Assembly Committee on Judiciary and adopted as the comment to Evidence Code section 1250. (See 29B West's Ann. Evid. Code (1966 ed.) § 1250, p. 271.) If the Legislature intended to

[2]Evidence Code section 1250 provides: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

disapprove *Alcalde,* and to adopt Justice Traynor's dissent as appellant suggests, this seems an odd way of doing it.

We do not decide that question, however, because it appears from the record that the disputed evidence, assuming it was erroneously admitted, was cumulative of appellant's own testimony and therefore harmless. Appellant testified that on Sunday night he arranged with Ms. T. to return to her apartment on Monday night with the credit card and other items. It was not until after she had returned home from her mother and sister's house after work Monday evening that he said he called to tell her he was unable to use the card. Appellant thus admitted the truth of the inference from the hearsay statements to which he objects: that at the time the statements were made, both the victim and appellant anticipated that he would visit her at her apartment that night. Appellant does not suggest that but for the admission of Ms. T.'s hearsay statement he would not have taken the stand, nor, judging from the nature of the balance of the prosecution's case, does that seem at all likely. Assuming the putative error to be of federal constitutional dimensions (cf. *Ohio* v. *Roberts* (1980) 448 U.S. 56, 65-66 [65 L.Ed.2d 597, 607-608, 100 S.Ct. 2531]), our review of the record convinces us that it was harmless beyond reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

B.  *Sufficiency of the evidence of rape.*

■ Appellant contends that the evidence was insufficient to support a finding that he, or anyone, committed an "act of sexual intercourse" with the victim, and thus insufficient to prove that element of rape[3] beyond a reasonable doubt. While conceding that Ms. T. was the victim of a sexual assault, and that in the course of the assault her vagina was penetrated by something, he argues that the evidence was insufficient to establish that it was penetrated by a penis.[4] He points to the absence of semen deposits, foreign pubic hairs, or trauma to her vagina, thighs, or

---

[3]In December 1978, Penal Code section 261 provided in pertinent part: "Rape is an act of sexual intercourse, accomplished with a female not the wife of the perpetrator, under either of the following circumstances: . . . 2. Where she resists, but her resistance is overcome by force or violence; 3. Where she is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution, or by any intoxicating narcotic, or anaesthetic substance, administered by or with the privity of the accused: . . ."

[4]Respondent appears to concede, and we assume, that penetration by a penis is intrinsic to the meaning of "sexual intercourse" in Penal Code section 261. Compare Penal Code section 289, which defines the crime of penetration by a "foreign object," defined to exclude "any part of the body." Quaere: what crime is committed by penetration with a part of the body other than the penis?

lower abdomen, and to the pathologist's testimony that the labial bruises were caused by "a fairly smooth surfaced instrument" which he could only say was "consistent" with a human penis.

Our duty, as to this contention, is to "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; accord, *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

The evidence of rape may be summarized as follows. Ms. T. was home alone. She had arranged to meet with appellant, a young man her age with whom she had been romantically involved in the past. She was found dead the next day on her back, on the floor of her living room. Her sweater and bra were both pushed above her breasts. Her pants and underpants were removed from one leg and bunched up around the foot of the other. Her legs were spread. There was no evidence that she had been dragged. (Cf. *People* v. *Craig* (1957) 49 Cal.2d 313 [316 P.2d 947].)

There was also evidence of actual penetration. Among other wounds she had two bruises on her labia. The pathologist testified in detail about the bruises. He found one on the right labia majora, and one on the left labia minora. Each bruise was approximately two centimeters in length and was caused by a fairly smooth-surfaced instrument. The bruising was consistent with a human penis.

There was no evidence of any foreign object present which would account for the bruising. There was no other evidence which affirmatively tended to negate a finding of rape. The labial bruises were caused at about the same time as the bruises around the neck which were consistent with a hand, and about 10 minutes prior to the abdominal stabbing which quickly resulted in death. There had also been stabbing around the front of the neck and chest. There was evidence that Ms. T. resisted her assailant by scratching the left side of his face with her fingernails.

Various cases cited by appellant are all distinguishable from this case in material respects. In some there was no proof of penetration at all, at the relevant time, or with an instrumentality consistent with a penis.[5] In

[5](E.g., *People* v. *Gutierrez* (1950) 35 Cal.2d 721 [221 P.2d 22]; *People* v. *Subia* (1966) 239 Cal.App.2d 245 [48 Cal.Rptr. 584]; *People* v. *Craig* (1957) 49 Cal.2d 313 [316 P.2d 947].)

others, the victims were so young that (1) their sexual organs had not developed, and penetration by a smaller object would cause more damage, and (2) resistance was less likely and more easily overcome.[6] Here, of course, there was ample evidence that Ms. T. resisted and that her assailant wielded a knife and caused neck bruises with his hand at about the same time that the labial bruises were inflicted. The knife was the only foreign object retrieved, and it was not consistent with the labial bruises because it was sharp.

In any event, other cases are of limited relevance because each case necessarily depends upon its own facts. Moreover, what the pathologist can say from a laboratory examination is more limited than what a reasonable trier of fact may find beyond any reasonable doubt, after considering the evidence as a whole. The trial court here recognized this in denying appellant's motion for acquittal on the rape count: "So we have got the bruising around the vaginal area; we got the bruising occurring by an instrumentality, at least evidence indicates an instrumentality, which is a smooth surface. We have it occurring about the same time as all the other events contributing to her death, and then we have the additional evidence about her position, plus the array or disarray of her clothing. I think the totality of all that evidence is sufficient to allow that count to go to the jury, and I am going to allow it." ▆ ▆▆▆ We agree with the trial court that the evidence in this case when viewed as a whole is such that a reasonable trier of fact could. find appellant guilty of rape beyond a reasonable doubt.[7]

## C.  *Failure to instruct sua sponte on lesser included offenses of rape.*

▆ Appellant contends that even if the evidence was sufficient to prove rape, the trial court committed reversible error in failing to

---

[6](*People* v. *Gutierrez, supra,* 35 Cal.2d 721; *People* v. *Borders* (1972) 37 Mich.App. 769 [195 N.W.2d 331]; *Vasquez* v. *State* (1942) 145 Tex.Crim. 376 [167 S.W.2d 1030]; *McCall* v. *Commonwealth* (1951) 192 Va. 518 [65 S.E.2d 540]; *Ritchie* v. *State* (1963) 243 Ind. 614 [189 N.E.2d 575]; *Commonwealth* v. *Grassmyer* (1975) 237 Pa.Super. 394 [352 A.2d 178].)

[7]Because there was sufficient evidence to support a finding of actual rape, there was no error in instructing the jury on the felony-murder doctrine, and the conviction of murder in the first degree is also affirmed.

Appellant further argues that the felony-murder rule should be abrogated as contrary to public policy, and that it violates federal and state due process standards. Appellant's contention that a reinterpretation of the felony-murder rule is necessary cannot be accepted by an intermediate appellate court. (*People* v. *Terrill* (1979) 98 Cal.App.3d 291, 305 [159 Cal.Rptr. 360].) The California Supreme Court has reiterated the felony-murder doctrine on numerous occasions, and the present challenge may appropriately be addressed to that court.

instruct the jury *sua sponte* on the lesser included offenses of simple assault, battery, and assault with intent to commit rape.

An instruction relating to a lesser included offense is required only where the evidence is susceptible to an interpretation which, if accepted by the trier of fact, would render the defendant guilty of the lesser included offense rather than the specifically charged offense. (*People* v. *Morales* (1975) 49 Cal.App.3d 134, 139-140 [122 Cal.Rptr. 804]; *Hopper* v. *Evans* (1982) 456 U.S. 605, 610 [72 L.Ed.2d 367, 372, 102 S.Ct. 2049]; Witkin, Cal. Criminal Procedure (1978 pocket supp.) § 480A.) Where there is no substantial evidence to support the lesser offense so that the defendant is either guilty as charged or not guilty at all, it is not proper to instruct on the lesser included offense. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323-325 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Avalos* (1979) 98 Cal.App.3d 701, 718-719 [159 Cal.Rptr. 736]; *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Berry* (1976) 18 Cal.3d 509, 519 [134 Cal.Rptr. 415, 556 P.2d 777]; *People* v. *Wall* (1979) 95 Cal.App.3d 978, 989-990 [157 Cal.Rptr. 587].) "Supposition or speculation is not an appropriate basis for instructions since it is not evidence." (*People* v. *Strawder* (1973) 34 Cal.App.3d 370, 380 [108 Cal.Rptr. 901].)

Here the record is clear that there was a completed sexual assault, and appellant so concedes in his brief. The only issues were the nature of the instrumentality used and the identity of the assailant. Thus, instructions on assault, battery, or assault with intent to rape were not required.

At trial, the entire thrust of the defense was alibi. (See *People* v. *Medina* (1978) 78 Cal.App.3d 1000, 1006 [144 Cal.Rptr. 581].) "The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts." (*People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116); see also *People* v. *Ibarra* (1982) 134 Cal.App.3d 413, 419 [184 Cal.Rptr. 639].) We decline the invitation to impose such a burden on the trial court here.

D. *The trial court's authority under Penal Code section 1385 to strike the special circumstances.*

■ The jury found appellant guilty of murder in the first degree, and found the special circumstance alleged—that he murdered his victim during the commission or attempted commission of rape—to be true. Accordingly, the trial court proceeded to sentence appellant to life

imprisonment without the possibility of parole pursuant to Penal Code section 190.2. There was no hearing to consider mitigating circumstances pursuant to Penal Code sections 190.3 and 190.4, because the death penalty was not sought by the prosecution. Although the sentencing judge indicated that he had read and considered the recommendations and comments made in the probation report, he appeared to reason that imprisonment for life without the possibility of parole necessarily followed the conviction of first degree murder coupled with the special circumstance finding.

After the trial of this case, the California Supreme Court handed down its decision in *People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029], holding that trial courts have the authority under Penal Code section 1385[8] "to dismiss special circumstance findings in order to make it possible for a person to be eligible for parole." (*Id.*, at p. 489.) Because the trial court in *Williams* had indicated that it wanted to strike the special circumstance but believed it was without power to do so, the Supreme Court remanded the case to have the trial court exercise its discretion. (*Id.*, at pp. 477, 492.)[9]

In our view, a remand is appropriate in this case as well. At the time of appellant's sentencing, it had not been established that sentencing courts had discretion in Penal Code section 190.2 cases. (See, e.g., *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 441-443 [134 Cal.Rptr. 650, 556 P.2d 1101]; cf. *People* v. *Tanner* (1979) 24 Cal.3d 514, 520 [156 Cal.Rptr. 450, 596 P.2d 328].) Under those circumstances, and in the absence of any suggestion in the record that the trial court exercised its discretion, the usual presumption that the trial court considered the various alternatives and acted correctly—a presumption which the People urge upon us as grounds for refusal to remand—can have no logical application. Given the nature of the appellant's interest at stake, the relatively minor inconvenience to the state in requiring reconsideration in accordance with *Williams, supra,* 30 Cal.3d 470, is a small price to pay for assuring that his arguments are

---

[8]Section 1385 reads: "The judge or magistrate may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading."

[9]For cases pending on appeal at the time an apparent change in sentencing procedures is declared, the appropriate remedy is a remand to have the trial court exercise its discretion. (See *People* v. *Martin* (1971) 17 Cal.App.3d 661, 673-674, fn. 2 [95 Cal.Rptr. 250].) For other affected defendants, a habeas corpus petition with the superior court, inviting it to exercise its discretion, is the proper procedure. (*People* v. *Tenorio* (1970) 3 Cal.3d 89, 95-96, fn. 2 [89 Cal.Rptr. 249, 473 P.2d 993].)

adequately considered. We, of course, express no opinion on the merits. We cannot say, however, with the requisite degree of confidence, that the same sentence would have been imposed had the trial court been aware of its authority to exercise discretion in accordance with the *Williams* rule.

E. *The constitutionality of Penal Code section 190.2.*

Appellant contends that mandatory punishment of life without possibility of parole without regard to mitigating factors is cruel and unusual punishment in violation of the California Constitution.[10] He does not contend, however, that life imprisonment without parole is unconstitutional in every case of murder. Finally, he concedes that if on remand the trial court exercises its powers under Williams to strike the special circumstance, this would obviate the constitutional questions in his case. Because of this possibility, we do not reach his constitutional arguments now.[11]

The case is remanded to the trial court for exercise of the court's discretion to determine whether or not there is a basis for dismissing the finding of special circumstances, and for further sentencing proceedings if and as required after the ruling on that issue. In all other respects, the judgment is affirmed.

Smith, J., concurred.

**ROUSE, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent that it affirms defendant's conviction of first degree murder, rape and conspiracy to commit credit card forgery. I respectfully dissent, however, from the majority's order remanding this case to the trial court

---

[10]We note that this issue is currently pending before the California Supreme Court in *People* v. *Zimmerman,* Crim. 21858. Appellant also argues that the California Constitution and Penal Code prohibit the imposition of life imprisonment without possibility of parole for unintentional killing, deemed first degree murder only by virtue of the felony-murder rule. This issue is also pending before the California Supreme Court in *People* v. *Kelly,* August 6, 1981 Crim 22137, *People* v. *Marler,* June 16, 1982 Crim. 22650, and *People* v. *Marshall,* October 7, 1981, Crim. 22267. Appellant does not explain however, how the jury could have found the killing in this case to have been unintentional. And there is certainly no evidence that it was done by an accomplice. In *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], the United States Supreme Court held that the imposition of the death penalty on a defendant who neither attempted to kill nor contemplated that life would be taken is inconsistent with the Eighth and Fourteenth Amendments to the United States Constitution.

[11]Defendant also contends that the sentence of life without possibility of parole is precluded by the prosecution's decision not to seek the death penalty against him. (See *People* v. *Davis* (1981) 29 Cal.3d 814 [176 Cal.Rptr. 521, 633 P.2d 186]; *Carlos* v. *Superior Court,* hg. granted October 23, 1981.* In light of our remand, we likewise need not reach that question at this time.

---

*Reporter's Note: For Supreme Court opinion see 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].

so that it may be determined whether there is a basis for dismissing a finding of special circumstances.

Unlike the facts which constituted the basis for a similar order of remand by the California Supreme Court in *People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029], I find nothing in the record before us which suggests that the trial court expressed any doubt or reluctance about the propriety of imposing a life sentence without possibility of parole upon this defendant.[1] Certainly, the facts of this brutal crime fully warrant the imposition of such a penalty.

Notwithstanding the majority's statement of neutrality on the question, I firmly believe that, under the circumstances, a trial court will interpret the order of remand, coming from a higher court, as a strong suggestion that it should reduce the penalty by striking the jury's finding of special circumstances. In my opinion, such an order, in this instance, is highly inappropriate.

I would affirm the judgment and sentence in its entirety.

A petition for a rehearing was denied November 5, 1982, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied December 22, 1982.

---

[1]In *People* v. *Williams, supra,* 30 Cal.3d at page 477, the court pointed out that "At the sentencing hearing, the court stated its opinion that life imprisonment without possibility of parole was appropriate for Eddie Palmer because he had armed himself and stabbed the victim. (See fn. 4, *ante,* [majority opn., p. 453].) The court continued, 'Insofar as this defendant is concerned, the evidence appears that she was one of the persons who planned the operation, she was the person who applied one ligature to the mouth of the victim and behind the neck. [¶] Now, by the testimony of the doctor it appears because of the age of the victim and the fragility of the neck bones that the application caused a fracture in one of the processes of the neck which, in turn, put pressure on the spinal cord. [¶] This doctor without dispute said that as to cause of death, without medical intervention either the stab wound and/or the application of ligature and fracture with the pressure on the spinal cord together or separately would ultimately have brought the death of the lady. [¶] But on a scaling, I feel that on culpability this defendant was much less culpable than the defendant Eddie Palmer.

" 'My desire legally would be to sentence this lady and eliminate by staying the execution of the special circumstances and eliminate the without possibility of parole. I do not believe that looking at the Penal Code and the intent of the Legislature and as interpreted by the Appellate Courts, I do not believe I have that power. So I will have to sentence as I did with Eddie Palmer.' The court thereupon sentenced appellant to life imprisonment without the possibility of parole.