Filed 7/15/13  P. v. Lopez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MICHAEL LOPEZ,<br><br>  Defendant and Appellant. | B238805<br><br>  (Los Angeles County Super. Ct.<br>   No. MA047412) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Chung, Judge.  Affirmed as modified.

Cannon & Harris and Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

_____

The jury found defendant and appellant Michael Lopez guilty in count 1 of second degree murder (Pen. Code, § 187, subd. (a))[1] and in counts 2 and 3 of attempted murder (§§ 664, subd. (a) & 187, subd. (a)). Allegations that the attempted murders in counts 2 and 3 were deliberate and premeditated were found not true. The jury found true the allegations that defendant personally and intentionally used and discharged a firearm, causing great bodily injury or death in commission of all three counts (§ 12022.53, subds. (b-d)), and that the offenses were committed at the direction of or for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)).

The trial court denied probation and sentenced defendant to 40 years to life on count 1, comprised of a base term of 15 years to life (§ 187, subd. (a)) and a consecutive enhancement of 25 years to life for use of a firearm. As to count 2, the court ordered defendant to serve the aggravated term of nine years for the attempted murder, enhanced by consecutive terms of 10 years for the gang finding and 25 years to life for the firearm use. With respect to the attempted murder in count 3, defendant was sentenced to 2 years 4 months, plus consecutive enhancements of 10 years for the gang finding and 25 years to life for the firearm use. The court stayed sentencing on the remaining gun enhancements.

Defendant contends: (1) the trial court erred in failing to instruct the jury on imperfect self-defense; (2) the trial court's response to the jury's request for clarification of the definition of "kill zone" prejudiced him; (3) there is insufficient evidence to support the true finding on the gang allegations; (4) the abstract of judgment and minute order must be corrected to reflect that defendant is prohibited from possessing or owning firearms or ammunition; and (5) the 10-year gang enhancement in count 3 should be reduced to 3 years 4 months. Defendant also requests that this court review the personnel records of two police officers pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

We modify the 10-year sentence for the gang enhancement in count 3 (§ 186.22, subd. (b)(4)) to a term of 3 years 4 months and direct the trial court to correct the errors in

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

2

the abstract of judgment and minute order to conform to the trial court's pronouncement at sentencing. In all other respects, the judgment is affirmed.

## FACTS

*Prosecution Evidence*

About a month before the incident in this case occurred, defendant was in custody on other charges and agreed to give police information on the illegal activities of twins Derek and Darion Smith in exchange for leniency. Defendant was a close friend of the Smith twins and was also friendly with their younger brother, Zyon.[2] Soon afterward, police raided the Smith house, where they found contraband, including drugs and weapons. The Smith twins were arrested, and one of the twins was kept in custody. Zyon thought defendant was the snitch but did not confront defendant.

On October 20, 2009, Zyon got a telephone call from Sheliece Dugan. She told Zyon that defendant pulled a gun on her and accused her of calling him a snitch. Dugan also told Zyon that defendant "stopped on the bus" and said, "I ain't no snitch."

At around 7:30 that evening, Zyon and his friends Chad Johnson and Ephron Vivion went to an apartment complex on Larkin and East Avenue Q-3 in East Palmdale to confront defendant about the incident with Dugan. When they approached defendant, he was with three or four other men that Zyon did not recognize. Zyon asked defendant what was going on. Defendant responded by pulling out a gun. Defendant said he was not a snitch and threatened to shoot if anyone had a problem with him. He cocked the gun but kept it pointed toward the ground. Zyon, Johnson, and Vivion backed away and went to a party down the street.

---

[2]     Because they share the same last name, we refer to the Smith brothers as Zyon, Derek, and Darion to avoid confusion.

Zyon, Johnson, and Vivion stayed at the party for about 30 minutes and then returned to the apartment complex to get a ride home from a friend. While they were waiting at the security gate, Zyon heard gunshots and saw sparks. He, Johnson, and Vivion started to run through the gate, which had begun opening. Zyon heard Johnson say he had been shot, and then Zyon realized that he had also been shot in the shoulder. Zyon saw the shooter standing about 25 to 40 feet away behind a concrete wall where some bricks were missing. The shooter was wearing the same clothing defendant was wearing when he threatened the group with a gun. Zyon testified inconsistently as to whether he saw defendant's face, but he knew defendant was the shooter.

Johnson died of a gunshot wound to the left side of his abdomen. A projectile was recovered from Johnson's body. The bullet trajectory was slightly back to front and left to right. Officers found a bullet strike on the metal security gate to the apartment complex and another bullet strike east of the gate. A projectile was found embedded in the gate and another was located on the ground. Four shell casings were recovered under a car to the east of the apartment complex a few days later. The four shell casings were .40-caliber Smith & Wesson.

Zyon testified he had known defendant for years. Defendant was a member of the Crazy Kings Familia ("CKF") gang. He had "Palmas" tattooed on his arm. Defendant's gang moniker was Huero, meaning White boy. Zyon, Johnson, and Vivion were members of the PJ Watts gang. Zyon's moniker was Little Grimy. Johnson was Zyon's Big Homey. Zyon testified that his brothers Derek and Darion were not gang members. Zyon did not believe there were any problems between PJ Watts and CKF. He got along with defendant. He did not believe the shooting was gang-related.

A transcript of defendant's statement to police was admitted into evidence. Defendant said that the day before the shooting, one of the twins had put a gun to his head and said he was going to kill defendant. He demanded that defendant tell him whether he snitched on the twins. Defendant said he did not snitch, and the twin let defendant go because he believed him.

4

In the afternoon on the day of the shooting, a Black girl came out of an apartment with her brother and said that defendant snitched. Her brother said, "I got something for you, Blood, come closer." Several Black people who defendant called "PJs" came over with their hands in their sweaters, as if they had guns. The group of men was "15 deep," and Zyon was there. The men called defendant a "damn motherfucker," cursed him for "snitchin'," and told him, "I'm Bloods, I'm Crip. You dead." They told defendant that he would be dead by that night, and that they knew where he lived. Defendant ran up to the men pretending to have a gun and said, "I don't know who the fuck you guys are." The men ran away, and defendant went back inside another apartment.

When the officers asked who shot the victims, defendant said Daniel Lipson, who he called Pupu, did it. Defendant said, "It was PuPu. He pulled the gun on him. He did it. He called me and told me he did it. I told him, 'You fucked up.'" Lipson told defendant the victims "ran up on him," pulled a gun, and shot twice. Lipson fired back and fled the scene.

Defendant stated that he fled the apartment complex with Lipson. He went to Chewy's house. Defendant did not come back to the apartment complex, and he did not shoot anyone. He got a call telling him that he was wanted for a shooting.

Adrianes Henry heard gunshots from the shooting. He saw a man who looked Hispanic and was the same size and height as defendant running across a dirt field with a gun in his hands. Henry identified defendant as the person he saw running with the gun, although he was not able to see the person's face.

Dugan was in her apartment when she heard gunshots. She looked outside, but she did not remember if she saw defendant shooting anyone. She did not want to testify. Detective Boyd Zumwalt testified that when he interviewed her, Dugan told him defendant was the shooter. She also told Detective Zumwalt she did not want to be involved.

Lipson testified that he heard about the shooting, but he was not the shooter.

Gang expert Detective Tyrone Berry testified that CKF and PJ Watts were criminal street gangs. Defendant admitted to Detective Berry and other officers that he

5

was a member of CKF.  Defendant had a Palmas tattoo on his forearm and CKF tattooed on his back.  Lipson is also a member of CKF.  PJ Watts is a primarily Black criminal street gang originating in Watts.  There was hostility between PJ Watts and CKF due to an influx of Black PJ Watts members to a predominately Hispanic area in East Palmdale.  Detective Berry believed the hostility resulted in two unsolved murders involving PJ Watts and CKF members and was the cause of a large fight that occurred a week before the shooting.

Detective Berry testified that within the gang community, snitching is the worst thing that a person can do because it indicates that that person is untrustworthy.  He explained that it is worse to snitch on a rival gang member because the snitch upsets both their own gang and the rival gang.  Snitches may be exiled or murdered.  To redeem himself, a gang member must prove that he is not a snitch by committing a violent act to restore his reputation.  Shooting and killing a rival gang member would redeem a snitch.  Detective Berry opined that if a Hispanic gang member snitched on a Black gang member causing the Black gang member to go to jail, and the Hispanic gang member shot at other members of the Black street gang, his murder of a Black gang member would be committed for the benefit of a criminal street gang.  In this scenario, the Hispanic gang member enhances his reputation and elevates his status within his own gang because he is a killer.  Regardless of whether the Hispanic gang member actually snitched, no one would call him a snitch after such a violent act.  Even though rival gang members can be friends, gang affiliation overrides friendship.

### Defense Evidence

Kristopher Leivas lived in the apartment complex where the shooting occurred.  He knew defendant but was neither his friend nor his enemy.  Leivas was friends with Dugan and associated with Zyon.  Johnson was a friend of one of Leivas's friends.  At the time of the shooting, Leivas was visiting a neighbor in the apartment complex and heard Zyon and Johnson at the gate.  He opened the gate for them and heard gunshots.

6

He did not hear arguing prior to the gunshots. He heard Johnson say that he was shot, and he saw that Zyon was shot in the shoulder. Leivas testified that neither Zyon nor Johnson had a gun, and that they did not shoot anyone. He saw several people running towards the desert, but he did not see anyone shooting. Leivas did not recognize Lipson or Lipson's picture.

Marta Blanquel's daughter dated defendant before the shooting. Blanquel heard gunshots and saw a young man putting away a gun in her rearview mirror when she was parking her car at the apartment complex the night of the shooting. The man with the gun was not defendant. When shown a picture of Lipson at trial, she did not think Lipson was the man with the gun.

Sandra Herrera testified that defendant was in her apartment in the complex where the shooting occurred, from approximately 7:30 p.m. to 8:30 p.m. She dropped defendant off near his house, which was a five-minute drive from the apartment complex. She heard gunshots about 15-20 minutes after she returned. When she went outside, she saw several people fighting and a body in the street. She recognized some of the people involved in the fight but did not see defendant or Lipson.

Defendant testified that at around 7:00 p.m. on the night of the shooting, he went to the area of Larkin and East Avenue Q-3 because he was bored. He was hanging around the candy truck when he saw Lipson and Dugan. Dugan called him a snitch. He argued with her for calling him a snitch, and they also argued about defendant slapping Dugan on the butt, which he denied doing. Defendant did not see Zyon, and he did not pull a gun on him. Afterwards, defendant went to Herrera's apartment. He played dice, and then Herrera dropped him off near his house. He did not go directly home, but he also did not return to the apartment complex on Larkin and East. Defendant had no reason to kill Zyon, and he did not shoot at the victims.

Defendant testified he was under the influence of cocaine when he gave the statement to police. He lied about Lipson being the shooter. He did not know who the shooter was. He also lied about having a run-in with Zyon. He did not see Zyon that day. He lied when he told the police that he went to Chewy's house. He lied when he

said that one of the twins put a gun to his head and asked him if he snitched. The twins were not upset with him about snitching. He used to be in CKF, but he left the gang in 2006 or 2007.

## DISCUSSION

### *Lack of Instruction on Imperfect Self-Defense*

Defendant first contends the trial court erred in failing to instruct the jury on imperfect self-defense. We find this contention without merit.

"'A trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." [Citation.]' . . ." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824; see *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) This obligation includes the duty to give instructions on lesser included offenses. (*Ibid*.)

Imperfect self-defense is not a true defense, but a description of one type of voluntary manslaughter. (*Breverman*, *supra*,19 Cal.4th at p. 159.) Voluntary manslaughter is a lesser included offense of murder. (*People v. Lewis* (2001) 25 Cal.4th 610, 645; *Breverman*, *supra*, at p. 154.) Thus, in a murder case, the trial court must instruct on imperfect self-defense, as a form of voluntary manslaughter, if there is substantial evidentiary support to support the theory. (*Breverman, supra,* at p. 160.) The trial court's sua sponte duty arises even if the defendant objects to the instruction and regardless of the defendant's theory of defense. (*Id*. at p. 162.) We review de novo the claim that a trial court failed to properly instruct the jury on the applicable principles of law. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

In determining whether substantial evidence exists, trial courts should not usurp the jury's function of evaluating the credibility of witnesses. (*Breverman*, *supra*, 19 Cal.4th at p. 162.) Substantial evidence means, in this context, "'"evidence from which a jury composed of reasonable [persons] could . . . conclude[]"'" that the lesser offense, but not

8

the greater, was committed. [Citations.]" (*Ibid.*) Due process does not require more. (*Hopper v. Evans* (1982) 456 U.S. 605, 611.) Speculation is insufficient to require the giving of an instruction on a lesser included offense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.)

"""Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." [Citation.] . . .' [Citation.] [¶] '[T]he doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. We also emphasize what should be obvious. Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' . . ." [¶] . . . . [Citation.]' [Citations.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

In his opening brief, defendant relies heavily on evidence tending to show that he had an actual fear of danger to his life or great bodily injury. His contention fails, however, because there is no evidence in the record that danger was imminent. Defendant attempts to establish immediacy by arguing that the jury "could have very easily concluded that [defendant], while denying involvement, was actually describing what happened to him immediately before the shooting [in his recorded statement implicating Pupu]." There is no evidence in the record to support such a conclusion by the jury. Neither defendant nor any other witness in the case testified that the scenario defendant described with respect to Pupu was actually an account of defendant's own experience. Defendant consistently denied *any* involvement in the incident. Moreover, there is no evidence that the victims fired shots at defendant. The victims were unarmed, and the evidence lends no support to the conclusion that shots were fired in the

9

perpetrator's direction. The trajectory of the fatal wound Johnson sustained indicates that he was shot from behind. From this, it can be inferred that defendant was the aggressor. Any conclusion that defendant was relaying what happened to him rather than what he claimed happened to Pupu would necessarily be founded on speculation. Absent substantial evidence to support this theory, the trial court had no obligation to instruct on imperfect self-defense. (See *Breverman*, *supra*, 19 Cal.4th at p. 162.)

We conclude our discussion by quoting at length from our decision in *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1018-1019, which fully supports the conclusion defendant, who at all times denied the killing, was not entitled to instructions on imperfect self-defense. "We are persuaded that former Presiding Justice Otto M. Kaus set forth the law applicable to this case in *People v. Medina* (1978) 78 Cal.App.3d 1000, 1005-1006 [(*Medina*)], a decision materially different from and not discussed in [*People v.*] *Barton* [(1995) 12 Cal.4th 186]. In *Medina,* the defendant testified he did not shoot the decedent. The victim was shot while outside in a residential neighborhood. Defendant testified he was intoxicated and in his mother's home at the time of the shooting. ([*Medina*], *supra,* 78 Cal.App.3d at pp. 1002-1004.) Justice Kaus held the defendant was not entitled to voluntary manslaughter instructions based on diminished capacity; the reason--the defendant testified he was not present when the victim was murdered. Justice Kaus wrote: 'The issue is not as defendant argues, whether he was entitled to have the jury instructed on inconsistent defenses. Of course he was. (E.g., *People v. Rodriguez* (1969) 274 Cal.App.2d 487, 497-498 . . . ; *People v. Stewart* (1968) 267 Cal.App.2d 366, 374 . . . .) It is, more simply, whether a defense "deserving of any consideration whatever," inconsistent with defendant's alibi was presented. [¶] We do not question a jury's right to accept part of the testimony of a witness, while rejecting the rest. (E.g., *Hansen v. Bear Film Company Inc.* (1946) 28 Cal.2d 154, 184 . . . ; *People v. Langley* (1974) 41 Cal.App.3d 339, 348 . . . .) Yet, while the rule that liars often speak the truth is, as Wigmore points out (3A Wigmore, Evidence, § 1010 (Chadbourn rev. 1970)) rooted in experience and common sense, these faculties--rather than any legalistic formula--also tell us how far the rule can be stretched in any particular case. [¶] Here the

10

entire thrust of the defense testimony was that at the time of the murder defendant was at his mother's home. Obviously it did not trigger a reasonable doubt that he was, in fact, participating in a well executed, hit-and-run street assassination. It defies common sense that a jury, which has so decisively rejected the alibi sworn to by four witnesses, would nevertheless rely on one incidental aspect of that alibi—defendant's intoxication—for the purpose of entertaining a reasonable doubt as to his capacity to harbor malice seven blocks away. To have given the requested instructions would have been an insult to the jurors, as well as an embarrassment to the law, the court and even, we suspect, to the defense.' ([*Medina*], *supra,* 78 Cal.App.3d at pp. 1005-1006, fn. omitted.) In the footnote to the foregoing cited language, Justice Kaus emphasized that there was an absence of any judicial error and the opinion did not turn on questions of prejudice. He wrote: 'How does one shift gears from a solid, total defense presented by a handful of witnesses, to a partial one which demands that these same witnesses be branded as perjurers? This aside should not be misconstrued to mean that there was harmless error. There was no error.' (*Id.* at p. 1006, fn. 2.) Then—Presiding Justice Joseph R. Grodin's opinion in *People v. Chambers* (1982) 136 Cal.App.3d 444, 456, is in accord."

### *Clarification of the Term "Kill Zone"*

The trial court instructed the jury on attempted murder with Judicial Council of California Criminal Jury Instructions (2010-2011) CALCRIM No. 600. During deliberations, the jury requested clarification of the definition of "kill zone," specifically asking, "How was the kill zone we were shown in the closing argument defined? Is there further definition of a kill zone?" In response, the trial court referred the jury to the last paragraph of CALCRIM No. 600, which reads, as modified:

"A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Ephron Vivion, the People must prove that the defendant not only intended to kill Zyon Smith but also either intended to kill Ephron

11

Vivion, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Ephron Vivion or intended to kill Zyon Smith by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Ephron Vivion."

The trial court also provided the jury with additional clarification as follows:

"Under the kill zone theory, the fact that a person desires to kill a particular target does not preclude a finding that defendant also concurrently intended to kill others within the 'kill zone.' [¶] . . . [¶] Intent is concurrent when the nature and scope of attack, while directed at a primary victim, is such that one can conclude that the defendant intended to *harm* a primary victim by *harming* everyone in that victim's vicinity." (Emphasis added.)

Defendant contends the trial court erred in its response to the jury's request for clarification of the definition of "kill zone," by lowering the prosecution's burden of proof. Defendant specifically objects to the last sentence of the trial court's additional clarification, arguing that the use of the word "harm" rather than "kill" led the jury to erroneously believe that mere intent to harm was sufficient to convict defendant of attempted murder. The Attorney General contends that defendant forfeited the issue on appeal by failing to object at trial, or alternately, that the whole of the instructions made clear to the jury that the requisite intent was intent to kill, and not merely harm, the victims. Even assuming that defendant did not forfeit the claim by failing to object, we agree with the Attorney General that it fails on the merits.

"A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions. [Citations]" (*People v. Coddington* (2000) 23 Cal.4th 529, 594.) "'[T]he correctness of jury instructions is to be determined from the entire charge

12

of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)

A person who shoots at a group of people may be found guilty of attempting to murder everyone in the group, even if he or she primarily targeted only one of them, if the person also, concurrently, intended to kill others within the "'kill zone.'" (*People v. Bland* (2002) 28 Cal.4th 313, 329-330 (*Bland*).) "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone. . . .' [Citation.]" (*Ibid*.) The kill zone theory "addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted, persons." (*People v. Stone* (2009) 46 Cal.4th 131, 138 (*Stone*).) "[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 745-746.)

Here, we conclude that, viewing the clarification in context of the entire charge of the trial court, there is not a reasonable likelihood that the jury would have believed that proof of intent to harm was sufficient to convict defendant of attempted murder. The language of the trial court's additional clarification is identical to language contained in *Bland*, *supra*, 28 Cal.4th at page 329. Subsequent to *Bland*, our Supreme Court has noted that "[b]ecause the intent required for attempted murder is to kill rather than merely harm, it would be better . . . to use the word 'kill' consistently rather than the word 'harm.'" (*Stone, supra,* 46 Cal.4th at p. 138, fn. 3.) Although the consistent use of "kill"

is preferable, in *People v. Bragg* (2008) 161 Cal.App.4th 1385, it was held that use of the term "harm," as in *Bland*, does not in itself render the trial court's instruction incorrect if it is clear from the whole of the instructions that the harm referred to was "the ultimate harm of death and that the law required that defendant had to have intended to kill the victims." (*Id*. at p. 1396.)  That is the case here.  The jury was instructed that the perpetrator could intend to kill a particular person and everyone in the zone of harm, or kill zone, at the same time; that it could find defendant guilty of the attempted murder of Vivion under the kill zone theory *only* if it found that defendant intended to kill Zyon and either intended to kill Vivion or everyone in the kill zone; and that a guilty verdict for attempted murder *required* the finding that defendant had the intent to kill the victim.  These instructions clearly conveyed to the jury that the intent to kill was prerequisite to a finding that defendant was guilty of attempted murder and that the harm in question was death.  Accordingly, there was no legal error.

### *Gang Allegations*

Defendant contends there is insufficient evidence to support the true findings on the allegations that the charged felonies were "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" under section 186.22, subdivision (b)(4).  He argues that the disputes that led to the shootings were of a personal nature and not gang-related.  We disagree.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]   If the circumstances reasonably justify the trier of fact's findings,

14

reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'  [Citation.]"  (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)  Reversal on the ground of insufficiency of the evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the jury's finding].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Section 186.22 requires that the prosecution prove beyond a reasonable doubt that the underlying crime was committed:  (1)  for the benefit of, at the direction of, or in association with any criminal street gang; and (2)  with the specific intent to promote, further, or assist in any criminal conduct by the gang.  (*Albillar*, *supra*, 51 Cal.4th at pp. 63, 65-66.)

To meet the first prong, the crime must be gang-related.  (*Albillar*, *supra*, 51 Cal.4th at p. 60.)  A crime is not gang-related simply because it is committed by gang members.  (*Ibid.*)  However, where an expert opines that "particular criminal conduct benefited a gang by enhancing its reputation for viciousness[, this] can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22[, subdivision] (b)(1)."  (*Id*. at p. 63.)

As to the second prong of the enhancement, "specific intent to *benefit* the gang is not required.  What is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'"  (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198; see *People v. Villalobos* (2006)145 Cal.App.4th 310, 322.)  "'"[C]riminal conduct by gang members" [need not] be distinct from the charged offense, . . . [nor is the prosecution required to] establish specific crimes the defendant intended to assist his fellow gang members in committing.'"  (*Albillar*, *supra*, 51 Cal.4th at p. 66, quoting *People v. Vazquez* (2009) 178 Cal.App.4th 347, 353-354.)

In this case, evidence was presented that defendant was a member of the Crazy Kings Familia, a criminal street gang and a rival of the PJ Watts gang, to which all three victims belonged.  Defendant snitched on Zyon's twin brothers, which resulted in their

arrest, and in the case of one twin, prolonged detention. One of the twins was also a rival gang member. Defendant was confronted and threatened several times for being a snitch prior to the shootings. Detective Berry testified that snitching is the greatest offense a gang member can commit, and that the offense is even greater when committed against a rival gang member because the rival gang is likely to retaliate against both the individual member who snitched and the gang that the alleged snitch belongs to. To redeem his reputation, a gang member who is labeled a snitch must stand up for himself. This involves proving himself and his continued commitment to the gang by "putting in work," or committing an act of violence. If a gang member is accused of snitching by a rival gang member, shooting and killing a rival gang member will elevate his status within his gang. It will also enhance the gang's reputation to have a killer in their ranks.

"It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation. [Citation.]" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.) Here, based on the combination of defendant's known status as a member of a gang that was the rival of the victim's gang, his loss of status by informing on a gang member, Detective Berry's expert opinion that a gang member would need to retaliate to regain his reputation after snitching, and that the gang would benefit from such retaliation, is sufficient evidence to support the jury's findings with respect to the gang allegations.

### *Use or Possession of Firearms or Ammunition*

At sentencing, the trial court gave defendant notice that he was prohibited from possessing or owning any firearms or ammunition pursuant to section 12021. The minute order and abstract of judgment inaccurately reflect that the trial ordered that defendant be prohibited from owning, using, or possessing any dangerous or deadly weapons, including any firearms, knives, or other weapons. We agree with the parties that the minute order and abstract of judgment must be corrected to reflect the trial court's pronouncement at sentencing and order the trial court to do so. (*People v. Zachary*

(2007) 147 Cal.App.4th 380, 385 ["Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."].)

### *Gang Enhancement*

Defendant filed a supplemental brief in which he contends that the consecutive 10-year gang enhancement imposed in count 3 was unauthorized and must be modified to a consecutive term of 3 years 4 months. The Attorney General concedes this contention is correct. We agree.

"Section 1170.1 sets forth the sentencing protocol for felony offenses for which a determinate low, middle or upper term of incarceration is imposed. It also sets forth the rules for imposing a consecutive sentence through the designation of 'principal' and 'subordinate' terms. First, the trial court is required to select a base term—either the statutory low, middle or upper term—for each of the crimes. (§ 1170; Cal. Rules of Court, rule 4.405(2).) Second, if the court determines that a consecutive sentence is merited, it must designate the crime with the 'greatest' selected base term as the principal term and the other crimes as subordinate terms. (§ 1170.1, subd. (a).) Third, the court sentences the defendant to the full base term it selected for the principal term crime and one-third of the middle term for any crimes for which the sentence is ordered to run consecutively. (*Ibid.*; see *People v. Felix* (2000) 22 Cal.4th 651, 655.) A subordinate term is one-third of the *middle term* even if the trial court had initially selected the lower or upper term as the base term." (*People v. Neely* (2009) 176 Cal.App.4th 787, 797-798.) Section 1170.1, subdivision (a) further provides that "[t]he subordinate term for each consecutive offense . . . shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses."

Here, defendant was convicted of two counts of attempted murder, which carried determinate terms of imprisonment (counts 2 and 3). The trial court selected count 2 as the principal term crime and imposed the upper term of nine years. It designated count 3

as the subordinate offense, correctly imposing one-third of the middle term (seven years) for a sentence of two years four months in prison. The trial court imposed consecutive gang enhancements of 10 years (§ 186.22, subd. (b)(1)(C)) with respect to both counts, as well as consecutive enhancements of 25 years as to both counts under section 12022.53, subdivision (d). Although the other enhancements were correctly calculated, the trial court erred in imposing the 10-year gang enhancement on count 3. Because count 3 was the subordinate offense, the proper term is one-third of the 10-year term, or 3 years 4 months.

Imposition of one-third of the middle term for a special enhancement on a subordinate term is mandatory under section 1170.1, subdivision (a). The 10-year enhancement could not have lawfully been imposed under any circumstance in this case and was therefore an unauthorized sentence that this court may correct without remanding for further proceedings. (See *People v. Smith* (2001) 24 Cal.4th 849, 854.)

We modify the 10-year sentence for the gang enhancement in count 3 (§ 186.22, subd. (b)(4)) to a term of 3 years 4 months.

### *Pitchess Motion*

Defendant requests that this court independently review the record of the in camera hearing held on his motion filed under *Pitchess*, *supra*, 11 Cal.3d 531. In carrying out our duty to conduct an independent review (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1232), we issued a record correction order to have a complete record of proceedings. Having reviewed the corrected record and conducted an independent review of the proceedings, we hold the trial court did not abuse its discretion in ruling on the *Pitchess* motion.

18

## DISPOSITION

The trial court is instructed to strike from the abstract of judgment and minute order the prohibition against defendant owning, using, or possessing any dangerous or deadly weapons, including any firearms, knives, or other weapons, and correct the abstract of judgment and minute order to reflect defendant's prohibition from possessing or owning any firearms or ammunition.  The trial court is further instructed to amend the abstract of judgment to impose a term of three years four months for the gang enhancement (§ 186.22, subd. (b)(1)(C)) on count 3 and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


KRIEGLER, J.


We concur:


MOSK, Acting P. J.


KUMAR, J.*

---

*      Judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.