Filed 9/13/13  P. v. Ainsworth CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B240818 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA084832) |
| v. | |
| TYRELL AINSWORTH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tomson T. Ong, Judge.  Affirmed and remanded.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

A jury convicted defendant Tyrell Ainsworth of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the allegation that defendant personally used a firearm within the meaning of section 12022.53, subdivision (d). Defendant admitted the allegation that he had suffered one prior strike conviction. After defendant's successful motion to proceed in propria persona at the sentencing hearing, the court sentenced him to state prison for 75 years to life, consisting of 25 years to life for the murder, doubled pursuant to the "Three Strikes" law, plus a consecutive sentence of 25 years to life for the gun use enhancement.

Defendant contends on appeal that the trial court erred by refusing to instruct the jury regarding voluntary manslaughter because there was substantial evidence the killing was done in the heat of passion, and by admitting evidence that a shotgun not involved in the killing was found at defendant's residence. We are not persuaded by either of these arguments. However, we agree with defendant's further contention that because he was a minor at the time of the killing and the court did not consider the factors specified in *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*) before imposing a sentence of 75 years to life, we must remand the matter to the trial court to reconsider its sentencing decision in light of that case. We thus affirm the judgment of conviction but remand the matter to the trial court for resentencing.

Defendant also contends and the Attorney General concedes that the trial court imposed an erroneous fine and erred in calculating his presentence custody credits. Accordingly, we order that the abstract of judgment be corrected.

---

[1] All further undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

## I.     The Prosecution Case

### A.     The Murder

On February 7, 2010, Sherrice May, Robert Stepney, and defendant (known as "South" or "South Side") were at the home of Andrea Hood along with several other people. The group was hanging out, drinking, smoking marijuana, and using Ecstasy pills. The victim, James Withers, approached defendant repeatedly and tried to persuade him to commit a robbery with him, to "get in with [defendant]" and be able to "make money, too." Defendant got angry at Withers for talking openly about robberies in the group setting and for persisting in discussing the subject. While the group was near the apartment building's laundry room, Withers again brought up the subject and defendant pulled out a gun and pointed it at Withers's face, telling Withers to stop talking to him. Defendant said, "If I have to tell you again," implying they were going to fight. Defendant called Withers a derogatory name and said, "I'll kill you." Defendant's voice was not loud during this conversation. Stepney said the gun was a .380 semiautomatic pistol. May recalled seeing defendant with the gun before, as well as with a Mossberg shotgun. Defendant put the gun away and said he did not need a gun to fight, or "handle," Withers.

Defendant and Stepney then took Withers and dropped him off somewhere away from the gathering, expecting not to see him again that night. But shortly thereafter May, Stepney, and defendant drove a friend home then went to a nearby liquor store and Withers was there. Withers got in the back seat of the car with May, Stepney, who was in the front passenger seat, and defendant, who was driving. Withers asked defendant again about committing a robbery, and defendant responded that they would do it right then. As defendant drove he repeatedly told Withers that he had better be ready.

Defendant drove to a residential neighborhood. He said that various houses had too much light around them and kept driving until he found a dark area. Defendant stopped the car, told May to get into the driver's seat, and told Withers to get out of the

car. May thought they were going to rob someone. Defendant and Withers exited the car and May saw them standing at the right rear of the car; she adjusted the rearview mirror so she could see them. Seconds later, defendant pulled out his black handgun and pointed it at Withers's face. May saw a flash and heard a gunshot, then saw Withers fall and hit the trunk of the car. Stepney also saw the gunshot in the mirror.

Defendant got back in the car and asked if he had blood on his face. He told May to drive. He directed her where to go, saying "I noodled that n****r." Defendant warned May and Stepney that they "didn't see nothing." He said if what had happened got out he would know it was their fault, and he said if he was caught he would make it seem that all three of them were involved. He told them he would come get them in the morning to help him clean the car, and he did so. May said there was "blood and brains and a bunch of stuff all over the car."

May and Stepney knew defendant was a member of the South Side Compton Crips gang and they were afraid of him. After the shooting, defendant kept seeking them out, and they heard he was saying that he was going to kill them next. Both May and Stepney were afraid to testify at trial.

### B.    The Investigation

Law enforcement agents searched defendant's residence and found a .45 caliber revolver and a loaded pistol-grip Mossberg shotgun. Defendant's grandmother gave Long Beach Police Detective Daniel Mendoza a live .380 round of ammunition she had found in her bathroom after she heard defendant "racking" a gun in the bathroom. The grandmother knew defendant had a Mossberg shotgun and that he had chased a young man through the apartment courtyard with it.

Defendant attempted to flee from the police when they arrested him in order to question him regarding the Withers murder. He told the police he had been at a party with Withers the night the latter was killed. He said he had a black BB gun he carried for protection, and that he was waving it around at the party. He claimed to have given the BB gun to someone else. Defendant denied having anything to do with Withers's

4

murder. He said Withers had stolen things from the apartment where the party was held. Defendant told the detective that the police had nothing: no gun, car, or crime scene.

Police found a spent shell casing near Withers's body. Marks on that shell casing were compared to marks on the live .380 round found in defendant's grandmother's bathroom. Both rounds had been cycled through the same handgun.

## II. The Defense Case

Withers's mother, Karen Phillips, testified that Withers called her frequently to check in. On the night he was killed, he called and told her he was with May and would be staying at Andrea's home. He said he would be home the following day, after work.

May called later and asked Phillips if Withers was with her. This worried Phillips because Withers had said he was with May.

## DISCUSSION

## I. Instruction on Voluntary Manslaughter as a Lesser Included Offense

When discussing jury instructions with counsel, the court stated, "I don't have any basis [f]or any lesser in this case, including voluntary manslaughter, because there is no heat of passion issue and there is also no imperfect self-defense issue. Agree?" Counsel both agreed, and also agreed that the case involved the jury finding defendant either guilty or not guilty of murder.

On appeal, defendant contends that the trial court erred because there was evidence of an ongoing quarrel that night between defendant and Withers, and therefore the trial court should have instructed the jury, sua sponte, with CALJIC Nos. 8.40 (voluntary manslaughter), 8.42 (sudden quarrel or heat of passion), 8.43 (murder or manslaughter), 8.44 (no specific emotion alone constitutes heat of passion), 8.50, and 8.72 (doubt whether murder or manslaughter). Because we agree with the trial court that the evidence did not support giving the instruction, we find no error.

5

A trial court must instruct the jury on every theory of the case supported by substantial evidence (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047), and has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question regarding whether all the elements of the charged offense were present and the evidence would justify a conviction on the lesser offense. (*People v. Hughes* (2002) 27 Cal.4th 287, 365; *People v. Lewis* (2001) 25 Cal.4th 610, 645; *People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) "On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman*, *supra*, at p. 162.) Substantial evidence, in this context, means evidence that a reasonable jury could find persuasive. (*People v. Hughes*, *supra*, at pp. 366-367; *People v. Lewis*, *supra*, at p. 645; see also *People v. Middleton* (1997) 52 Cal.App.4th 19, 33, disapproved on other grounds in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752-753, fn. 3 [trial court need not instruct on an issue when the evidence in support is merely minimal and insubstantial].) On appeal, we review independently the question whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

"Voluntary manslaughter is a lesser included offense of murder. [Citation.] One form of the offense is defined as the unlawful killing of a human being without malice aforethought 'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a).) 'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man."' [Citation.]" (*People v. Cole, supra,* 33 Cal.4th at pp. 1215-1216.)

Evidence of provocation or heat of passion is simply not present in this case. Defendant's state of mind was never argued by the defense; rather, the defense theory was that defendant was not the shooter. He asserted May and Stepney killed Withers and blamed defendant. "Generally, when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense. (See *People v. Medina* (1978) 78 Cal.App.3d 1000, 1005-1006 [no duty to instruct on voluntary manslaughter based on diminished capacity when defendant testified he was not present when victim was shot].)" (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709.)

In addition, there is no evidence in the record suggesting any objectively reasonable provocation—that circumstances giving rise to a heat of passion existed from an objective standpoint—or demonstrating defendant subjectively acted under the heat of passion. Defendant points to the evidence that he was provoked by Withers bothering him repeatedly about committing a robbery as being sufficient. However, no rational trier of fact could conclude that such behavior was sufficient to arouse heat of passion in the mind of an ordinarily reasonable person. In addition, the evidence showed that significant time passed between the angry confrontation at Andrea Hood's party and the time that defendant calmly and dispassionately drove around looking for a dark place to stop and kill Withers, which he did moments after exiting the car and without yelling or appearing upset. Thus, the evidence did not support a finding that defendant was acting under the heat of passion. Even were we to accept that this was defendant's state of mind, we would not find the evidence sufficient to support an instruction on voluntary manslaughter. These facts and circumstances were not sufficient to arouse the passions of the ordinarily reasonable person. (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

In any event, the omission of instructions on voluntary manslaughter did not prejudice defendant. "[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165.)

7

Such an error is not subject to reversal unless, upon an examination of the entire record, it appears "reasonably probable" the defendant would have obtained a more favorable result had the error not occurred. (*Id.* at p. 149 [citing *People v. Watson* (1956) 46 Cal.2d 818, 836].) There is no reasonable probability that the jury would have rendered a verdict more favorable to appellant had voluntary manslaughter instructions been given. As we have discussed, there was no evidence of provocation.

In a related argument, defendant also contends that his first degree murder conviction was not supported by substantial evidence because it was inherently improbable that he would set out to kill Withers in front of two witnesses, and that if he had planned to kill Withers at the outset of the car trip he would have left May and Stepney behind. There is no merit to this argument. Rather, the evidence supports the conclusion that defendant calmly drove for some time until he found a location to carry out his plan to kill Withers, and after doing so threatened May and Stepney that if anyone found out, he would retaliate against them by saying they were involved or by killing them. He seemed to feel so invincible that he even forced them to clean their friend Withers's blood and brains off the car the next day. This was not the act of a person who had any compunction about killing someone in front of innocent witnesses.

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, the Supreme Court identified three categories of evidence which have been found sufficient to sustain a finding of premeditation and deliberation: (1) facts showing planning activity; (2) facts suggesting motive; and (3) facts about the manner of killing which suggest a preconceived design. "[I]t is not necessary that the *Anderson* 'factors be present in some special combination or that they be accorded a particular weight.' (*People v. Pride* (1992) 3 Cal.4th 195, 247.)" (*People v. Sanchez* (1995) 12 Cal.4th 1, 33.)

The evidence demonstrated that defendant engaged in planning activity. Defendant drove until he found a suitably dark spot, then got out of the car, bringing a gun with him, and immediately accosted Withers. The evidence, as defendant urges with regard to the previous portion of this discussion, was that defendant was angry that Withers kept pestering him about committing a robbery with him and defendant wanted

8

him to be quiet. Thus, evidence of a motive to act was present. Finally, facts about the manner of the killing suggest a preconceived design. As noted above, defendant told Withers to exit the car and took a gun with him. After a very brief verbal exchange, defendant pointed a gun at Withers's head and fired. This evidence readily supports the inference that defendant had one purpose in mind: to shoot and kill Withers. A conviction of premeditated murder requires a finding of specific intent to kill. "'"[I]ntent is inherently difficult to prove by direct evidence. Therefore, the act itself together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred." [Citation.]' [Citation.]" (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1469.) Shooting someone point blank in the head is, without question, sufficiently lethal that a jury could find there was sufficient evidence of intent to kill under the circumstances present here.

Finally, defendant contends that the trial court should have instructed on voluntary manslaughter because there was substantial evidence to support the instruction, and as a result of the court's error, the jury was not fully instructed on the prosecution's burden of proving the absence of heat of passion beyond a reasonable doubt. He claims "[t]he trial court invaded the province of the jury when it determined there was no evidence of voluntary manslaughter." As we have discussed, there was no substantial evidence to support the instruction on this claim.

## II.     Introduction of Evidence Regarding a Shotgun Not Used in the Killing

Defendant next contends that the trial court abused its discretion by admitting evidence that a Mossberg shotgun was found in the home where defendant sometimes stayed, even though the shotgun was not involved in the commission of the present offense. He contends its admission violated his federal and state due process rights to a fair trial and was more prejudicial than probative. He contends the shotgun was irrelevant and therefore inadmissible. We disagree.

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the

9

relative probativeness and prejudice of the evidence in question (e.g., *People v. Alvarez* [(1996)] 14 Cal.4th [155,] 214-215; *People v. Rowland* [(1992)] 4 Cal.4th [238,] 264). Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' (*People v. Alvarez*, *supra*, 14 Cal.4th at p. 204, fn. 14)." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

Defendant contends that admission of evidence regarding the shotgun was erroneous because it served only to prove his "prior bad acts," and as such is made inadmissible by Evidence Code section 1101, subdivision (a) (evidence of his character or a trait of his character offered to prove his conduct on the specified occasion of the charged murder). In *People v. Riser* (1956) 47 Cal.2d 566, our Supreme Court held: "When the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Id.* at p. 577.) On the other hand, the court has also held "'that when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapons, they may still be admissible.' (*People v. Cox* (2003) 30 Cal.4th 916, 956.)" (*People v. Homick* (2012) 55 Cal.4th 816, 876.)

Some degree of connection between the weapon and the crime must be shown in order for evidence of the weapon to be admissible. Here, evidence of the shotgun was relevant to show defendant's consciousness of guilt. Other evidence established that the murder weapon was a handgun defendant had in his possession when he racked the gun in his grandmother's bathroom; the markings on a live round of ammunition found on her bathroom floor immediately thereafter matched the markings on the bullet that killed Withers. May said before the murder she frequently saw defendant in possession of a black handgun, and that he often played with and stared at it. However, when defendant's residence was searched, other weapons were found, including the Mossberg shotgun witnesses testified defendant owned, but the black handgun was not recovered. The reasonable inference is that defendant disposed of the handgun after killing Withers

because he knew it could be connected to the murder. That inference was made stronger by comparison with the fact that he did not dispose of the shotgun. In other words, he specifically chose to discard the murder weapon, but kept a gun with no connection to the murder. Thus, the evidence of consciousness of guilt was established by the presence of the shotgun and the absence of the black handgun.

Further, we do not find that admission of the evidence of the shotgun was more prejudicial than probative. The trial court's decision to admit evidence of the shotgun was not beyond the bounds of reason, and cannot be said to have resulted in a manifest miscarriage of justice. (*People v. Waidla*, *supra*, 22 Cal.4th at p. 724.)

Even assuming for the sake of argument that admission of the shotgun was erroneous, there is no reasonable basis to argue that the jury's decision turned on the evidence that defendant possessed a shotgun. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The evidence of defendant's guilt was overwhelming.

### III. Sentence Must Be Reconsidered in Light of *Miller*

Because he was 17 at the time of the murder, defendant argues that his sentence of 75 years to life is unconstitutional.[2] He claims his sentence is cruel and unusual as shown by recent federal and state high court case law, specifically *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455]; *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*); and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). We conclude this matter should be remanded for resentencing in light of recent case law.[3]

In *Miller*, *supra*, 567 U.S. at page ___ [132 S.Ct. at page 2475], the Supreme Court recently determined mandatory life-without-possibility-of-parole sentences for juvenile offenders who commit homicide violate the Eighth Amendment's ban on cruel

---

[2]    Defendant was born on July 11, 1992. When the murder took place in February 2010, defendant was 17 years old.

[3]    Sentencing took place on April 26, 2012, and *Miller* was decided on June 25, 2012.

and unusual punishment, emphasizing the necessity for "the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles."

The *Miller* court explained: "*Roper* [*v. Simmons* (2005) 543 U.S. 551, 125 S.Ct. 1183] and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most severe punishments.' *Graham*, 560 U.S., at ___, 130 S.Ct. 2011, 176 L.Ed.2d 825. Those cases relied on three significant gaps between juveniles and adults. First, children have a '"lack of maturity and an underdeveloped sense of responsibility,"' leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569, 125 S.Ct. 1183, 161 L.Ed.2d 1. Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' *Id.*, at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2464].)

"[N]one of what *Graham* said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when (as in both cases here) a botched robbery turns into a killing. So *Graham's* reasoning implicates any life-without-parole sentence imposed on a juvenile, even if its categorical bar relates only to nonhomicide offenses." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2465].) "Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." (*Ibid.*) "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest terms of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham's* (and also *Roper's*) foundational principle: that imposition of

12

a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Id.* at p. 2466.)

In addition, "*Graham's* '[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment,' [citation], makes relevant here a second line of our precedents, demanding individualized sentencing when imposing the death penalty." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2467].) "Of special pertinence here, we insisted in these rulings that a sentencer have the ability to consider the 'mitigating qualities of youth.' [Citation.] Everything we said in *Roper* and *Graham* about that stage of life also appears in these decisions." (*Ibid.*) "'[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his culpability. [Citation.]" (*Ibid.*)

In summary, "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468].)

"We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469], citation omitted.) "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we *require* it to

take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."**4** (*Ibid.*, italics added.)

In *Caballero*, *supra*, 55 Cal.4th 262, 265, the California Supreme Court considered whether a 110-year-to-life sentence imposed on a juvenile convicted of nonhomicide offenses contravenes *Graham's* mandate against cruel and unusual punishment under the Eighth Amendment, and concluded that it does. The *Caballero* court expressly acknowledged that *Miller* "requires sentencers in homicide cases 'to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469].) [However,] [w]e leave *Miller's* application in the homicide context to a case that poses the issue." (*Caballero*, *supra*, 55 Cal.4th at p. 268, fn. 4.)

Defendant's sentencing predated *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455], and *Caballero*, *supra*, 55 Cal.4th 262. Defendant represented himself at sentencing and did not present to the trial court any evidence regarding the factors influencing his juvenile criminality, such as the nature of his home life or peer influences. We cannot conclude the trial court recognized the significance for sentencing purposes of defendant's youth in imposing a sentence that was the "functional equivalent" of life without possibility of parole. In light of the Supreme Court's clear admonitions that a sentence of life without possibility of parole is to be imposed on "'the *rare* juvenile offender whose crime reflects irreparable corruption,'" and that "we do not foreclose a sentencer's ability to make that judgment in homicide cases, [but] we *require* [a sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469], italics added), we conclude the required course in

---

**4** The *Miller* court emphasized: "[O]ur decision today retains [the] distinction [between homicide and nonhomicide cases]: *Graham* established one rule (a flat ban) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2466, fn. 6.)

this case is to remand the matter so the trial court will have the opportunity to reconsider its sentence in light of *Miller*.

We reject the People's argument that "the consecutive sentencing scheme under which [defendant] was sentenced differs from the mandatory schemes found unconstitutional in *Miller*, because it gives the court the discretion to impose a term that affords the possibility of parole," and the trial court was free to consider any relevant aggravating and mitigating factors, including defendant's youth. The salient point is that the trial court *did not* exercise its discretion to consider the significance for sentencing purposes of defendant's youth in imposing a sentence that was the "functional equivalent" of life without possibility of parole. Theoretically the trial court could have exercised its discretion to strike defendant's prior strike, but it did not so exercise its discretion on any grounds, let alone based upon defendant's youth or personal circumstances. The sentence imposed by the trial court was indeed based upon a mandatory sentencing scheme. (§§ 190, subd. (a), 12022.53, subd. (d).) On remand, the trial court is not foreclosed from imposing the current sentence, but it is required to consider defendant's individual circumstances and "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469].)

## IV.    Custody Credits

Defendant contends, and the People concede, that he is entitled to additional days of presentence custody credit. Defendant was arrested on February 19, 2010, and sentenced on April 26, 2012. The period between those two dates, including the day of sentencing, is 798 days. He received only 654 days of custody credit.

Pursuant to section 2900.5, subdivision (a), a defendant convicted of a felony is entitled to credit against a state prison term for actual time spent in custody before commencement of the prison sentence, including the day of sentencing. (§ 2900.5, subd. (a); *People v. Smith* (1989) 211 Cal.App.3d 523, 526.) Generally, an appellant may not appeal an error in the calculation of presentence custody credit unless the claim is first

15

presented in the trial court, which did not occur here. (§ 1237.1.) However, the Court of Appeal may address a presentence custody credit issue if other claims are also raised on appeal. (*People v. Mendez* (1999) 19 Cal.4th 1084, 1100-1101; *People v. Acosta* (1996) 48 Cal.App.4th 411, 420-421.)

Because the trial court only awarded defendant 654 days of custody credit, the abstract of judgment must be amended to reflect 798 days of actual custody credit.

## V.     Penalty Assessment

Defendant contends, and the People correctly concede, that the trial court erred in imposing a $1,000 assessment under section 1464 and Government Code section 76000. The fines imposed at sentencing were $10,000 restitution and parole revocation fines. (§§ 1202.4, subd. (b), 1202.45.) However, the additional penalty assessment does not apply to restitution fines. (§ 1464, subd. (a)(3)(A); Gov. Code, § 76000, subd. (a)(3)(A); *People v. Walz* (2008) 160 Cal.App.4th 1364, 1372.)

We note that the assessment was included in the minute order memorializing the sentencing, but does not appear in the abstract of judgment. Correction of the abstract of judgment is therefore not required, but we do find that the $1,000 assessment constituted an unauthorized sentence; such sentence may be corrected at any time even if the error was not raised in the trial court. (*In re Sheena K.* (2007) 40 Cal.4th 875, 886.)

## DISPOSITION

The judgment of conviction is affirmed, and the matter is remanded to the trial court with directions to reconsider its sentencing decision in light of the dictates of *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455]. After sentencing, the trial court is directed to prepare a new abstract of judgment reflecting the term imposed and the award of 798

days of presentence custody credit.  A copy of the abstract is to be forwarded to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

17